WAYNE HICKOX *et al.*, Plaintiffs and Appellees and Counterdefendants and Cross-Appellants, v. BILLY V. BELL *et al.*, Defendants and Appellants and Counterplaintiffs and Cross-Appellees (Indiana National Bank, Defendant and Cross-Appellee).

Fifth District   No. 5—87—0648

Opinion filed March 16, 1990.

978

Morris Lane Harvey and Heidi A. Hoffee, both of Law Offices of Morris Lane Harvey, of Fairfield, for appellants.

Terrell Lee Sharp and Matt E. Beal, both of Law Office of Terry Sharp, P.C., of Mt. Vernon, for appellees Wayne Hickox and Lucille Hickox.

Morris Lane Harvey and Heidi A. Hoffee, both of Law Offices of Morris Lane Harvey, of Fairfield, for appellee Indiana National Bank.

JUSTICE CHAPMAN delivered the opinion of the court:

On September 22, 1976, Wayne and Lucille Hickox entered into a written agreement for the sale and purchase of 864 acres of real estate with Barbara and Billy Bell. As the issues in this appeal center around the interpretation of that contract, we include herein pertinent portions of it:

"THIS AGREEMENT made this 22nd day of September, 1976,by and between WAYNE HICKOX and LUCILLE HICKOX, *** hereinafter called 'Sellers'; and BILLY V. BELL and BARBARA JOAN BELL, ***, hereinafter called 'Buyers.'

## WITNESSETH:

***

Said real estate to be conveyed is described as follows:

* * *

containing in all, 864 acres more or less in Wayne County, Illinois. ***

2. PRICE AND TERMS: In consideration thereof, Buyers herein agree to pay Sellers herein the sum of SEVEN HUNDRED THOUSAND DOLLARS ($700,000.00) In the manner following:

(a) The sum of ONE THOUSAND DOLLARS ($1,000.00) on the date of this offer and Acceptance and Earnest Money Receipt, dated July 2, 1976.

(b) On January 2, 1977, FORTY NINE THOUSAND DOLLARS ($49,000.00).

(c) Remaining SIX HUNDRED AND FIFTY THOUSAND DOL-

LARS ($650,000.00) shall be paid in annual payments commencing on December 1, 1977 and on December 1 of each year thereafter. The first five years, beginning December 1, 1977, payments shall be of interest only at 7½ per cent upon unpaid balance. The following fifteen years commencing December 1, 1982, the Buyers shall pay the annual payment of TWENTY THOUSAND DOLLARS ($20,000.00) plus interest of 7.5% on the unpaid balance to the Sellers as hereinafter stated. Any balance of the payment at the end of said twenty year period, to-wit: December 1, 1996, shall be due and payable by the Buyers to the Sellers herein. \*\*\*

(d) Buyers herein shall have the option to pay the unpaid balance of the principal due and payable, or any part thereof under this Contract in multiples of One Thousand Dollars at any one annual payment period herein provided.

### DISASTER CLAUSE:

It is further provided in said Contract that in the event the beans were less than twenty bushel[s] (20 bu.) per acre, corn less than fifty bushel[s] (50 bu.) per acre, or wheat less than twenty-seven and one-half bushel[s] (27½ bu.) per acre, or any one of them, that such yields shall be considered a disaster and the Buyers herein shall pay to the Sellers herein one-third of the annual payment, which is fixed at TWENTY THOUSAND DOLLARS ($20,000.00) per year payable as herein stated.
\*\*\*

### 4. ABSTRACT:

\* \* \*

Buyers herein shall have the option as payments are paid upon the entire purchase price, which total acreage is figured at approximately EIGHT HUNDRED FIFTEEN DOLLARS ($815.00) per acre and that as the Buyers herein have paid the annual amount of money upon said contract; said money shall entitle the Buyers herein to a Warranty Deed to such land as may then be paid for based on $815.00 per acre, except

The East Half of the Northeast Quarter of Section Nineteen, Township One North, Range Nine East of the Third Principal Meridian, containing 80 Acres more or less, all situated in the County of Wayne and State of Illinois

shall be sold at ONE THOUSAND DOLLARS ($1,000.00) per acre if so selected. All costs of deeds and abstracts in such event shall be at Buyers' expense; the conveyances selected by the Buyers shall be

carved out of the total acreage sold \*\*\*.

Upon execution of this Agreement, Sellers herein shall execute their Warranty Deed to the Buyers herein for Eight Hundred Sixty-Four Acres (864A) herein described, which may be amended if prior deeds are made as provided herein.

\* \* \*

7. <u>DEFAULT</u>: Time shall be of essence of this agreement, and in the event Buyers herein shall default in the making of any of the payments by it to be made hereunder, or in the performance of any other covenant by it made, and such default shall continue for sixty (60) days after Sellers herein have given Buyers herein written notice of such default, Sellers herein at their option may declare this Agreement forfeited and terminated, and may re-enter possession of the subject land and retain all monies paid hereunder as and for reasonable rentals and liquidated damages, but not as any penalty. In the event the Sellers herein default in the performance of any of the conditions and covenants on their part to be performed, and such default shall continue for sixty (60) days after Buyers herein have given Sellers herein written notice of such default, Buyers herein may, at their option, declare this Agreement forfeited and terminated and shall have cause against the Sellers herein for all real damages incurred thereby, together with a return of all money theretofore paid, plus the value of all improvements to said land less reasonable rental value thereof. Both parties do retain all alternative rights to have cause for specific performance of this Agreement, and the non-defaulting party shall be entitled to all reasonable attorney's fees, court costs and other expenses incurred in the enforcement of this provision as a part of their damages, whether at law or in equity, from the defaulting party.

\*\*\*

9. <u>SCOPE</u>: This agreement may be assigned by either party without the prior written consent of the other party; and the terms and covenants herein contained shall accrue to the heirs, devisees, executors, administrators, agents and assigns of the parties hereto, and in the event of such assignment, the assignors herein shall be relieved of liability. The Buyers may pre-pay the Contract or sell all or any part on Contract, but in such case, the Buyers shall remain liable to the Sellers herein."

The Bells paid the $1,000 earnest money deposit required under the contract. In addition, the record shows that payments under the contract to date, delivered to the Mt. Erie State Bank as escrow agent, are as follows:

| | |
|---|---|
| $49,000.00 (principal) | January 3, 1977 |
| $48,750.00 (interest) | December 1, 1978 |
| $48,750.00 (interest) | December 2, 1979 |
| $48,750.00 (interest) | December 1, 1980 |
| $48,750.00 (interest) | November 27, 1981 |
| $48,750.00 (interest) | December 1, 1982 |
| $20,000.00 (principal) | December 1, 1982 |
| $47,381.25 (interest) | December 2, 1983 |
| $6,666.67 (principal) | December 2, 1983 |
| $46,620.14 (interest) | December 1, 1984 |
| $6,666.67 (principal) | December 1, 1984. |

The record shows that the payments made up to and including the interest payment of December 1, 1980, were made by the Bells. The payments of November 27, 1981, and thereafter were made by Herbert and Victor Hess.

In a letter dated June 25, 1985, addressed to Mr. and Mrs. Hickox, Michael Molt, an attorney representing the Bells, requested that the Hickoxes execute a warranty deed conveying to the Bells 83.67 acres of the total 864 acres referred to in the contract. The letter explained that the contract between the Hickoxes and the Bells provides that the Bells are entitled to receive a warranty deed for certain real estate based on the amount of principal which has been paid to date. Mr. Molt noted that with the exception of a purchase price of $1,000 per acre allocated to one 80-acre tract, the contract specifies that the real estate is priced at $815 per acre. Mr. Molt calculated that to date $83,333.34 had been paid as principal under the contract. Mr. Molt advised the Hickoxes that the Bells desired to allocate $80,000 of that amount to the 80-acre tract priced at $1,000 per acre. The other 3.67 acres included in the deed were only part of the 4.089 acres, valued at $815 per acre, the Bells were to date entitled to receive. The 3.67-acre tract was improved with a machine shed, cattle feed bunk and feeding floor with a concrete lot and two steel harvester silos. The Hickoxes did not execute the deed nor did they reply to Mr. Molt's correspondence.

On November 25, 1985, Billy and Barbara Bell served a notice of termination of agreement for sale and purchase of real estate upon Lucille Hickox. The notice alleges that the Hickoxes are in default for failure to honor the requirement of the contract requiring the Hickoxes to deliver certain warranty deeds to the Bells. The notice provides that all obligations, responsibilities and requirements in the contract are terminated, and that possession of the real estate is returned to the Hickoxes.

Mr. and Mrs. Hickox subsequently filed a six-count complaint in the circuit court, naming as defendants Billy Bell, Barbara Bell and the Indiana National Bank as trustee under trust number 13917—005. Counts I, II and III, directed against the Bells, allege that the plaintiffs are not in default of the contract between the parties; the Bells failed to pay sufficient consideration to entitle them to conveyance of the realty they demanded; and the Bells are not entitled to a forfeiture or termination of the contract. The complaint also contains allegations that the Bells breached the contract by failing or refusing to make payments for 1985; to maintain the fertility of the land; and to maintain insurance on the land, or to otherwise repair the damage which has occurred to various buildings on the land. Plaintiffs claim that as a result of the Bells' breach of contract the value of the land has decreased substantially, resulting in damage to the plaintiffs in excess of $300,000.

Counts IV, V and VI of the Hickox complaint are directed at the Indiana National Bank as trustee under trust number 13917—005. Those counts allege that on or about December 31, 1980, the Bells entered into a contract for the sale and purchase of real estate with the Indiana National Bank, as trustee under the trust number above designated, as buyer. Pursuant to that contract the Indiana National Bank, as purchaser on behalf of Herbert and Victor Hess, agreed to assume the indebtedness of the Bells to the Hickoxes in the amount of $653,927.08, and to assume all covenants required of the Bells under their contract with the Hickoxes. Counts IV and V, with which we are concerned in this appeal, set forth the agreement between the Hickoxes and the Bells, the agreement between the Bells and the bank, and service of the demand for the deed by the Bells. Count IV prays that the court declare that the Hickoxes are not in default and that the agreement is in full force and effect. Count V sets forth the same allegations as count IV and further alleges that the bank failed and refused to make payments on the contract. That count asks the court to award the plaintiffs a money judgment against the bank for the past-due installments.

The Indiana National Bank filed a motion to dismiss those counts of the complaint directed against it. In an affidavit attached to the motion, attorney Michael Molt stated that after the bank entered into the contract with the Bells, it assigned the contract to the Hesses, and that after the assignment from the bank to the Hesses, the Hesses had possession and use of the property and made the payments on the contract. The affidavit further stated that in May of 1985 the Hesses entered into an agreement with the Bells under

which the Hesses assigned all of their right, title, and interest in the real estate back to the Bells. That contract, in effect, purported to relieve the Hesses and the bank from any obligation to pay the Hickoxes.

The trial court's docket entry, dated November 17, 1986, granted the Indiana National Bank's motion to dismiss, stating that "Counts IV and V make no allegation that a contractual relationship existed between the Bells and Bank when the agreement between Hickoxes and Bells was breached." Plaintiffs thereafter sought leave of court to amend the complaint as to the bank. The court denied the motion to amend and subsequently denied the plaintiffs' motion to reconsider.

The Bells filed a counterclaim. Count I of the counterclaim sought a declaration by the court that the contract between the parties is terminated, and that the Bells are entitled to reimbursement of all sums paid to the Hickoxes and are also entitled to attorney fees and costs incurred as a result of this action. The Bells in count II prayed for the same remedies as were requested in count I, and in the alternative prayed that the court order specific performance of the contract as to conveyance of the realty demanded by the Bells. Count III of the counterclaim requested that the court declare the contract terminated and award the Bells an amount equal to the fair market value of the realty which the Bells demanded the plaintiffs convey by deed. Count III also prayed for an amount equal to the reasonable attorney fees and costs incurred by the Bells in enforcing the contract.

Following a trial on the dispute between the Hickoxes and the Bells, the court entered a seven-page, written order on August 21, 1987. The court's findings included the following:

(1) The parties entered into a contract for the sale and purchase of real estate.

(2) Pursuant to the contract, the defendants were entitled to a warranty deed to portions of land conveyed under the contract prior to the completion of said contract as principal payments were paid toward the contract. The amount of land to which they were entitled was to be based upon a value of $815 per acre except for one 80-acre tract which is to be valued at $1,000 per acre.

(3) That as of June 25, 1985, the defendants had paid toward the principal amount owed $83,333.34.

(4) The failure of plaintiffs to deliver the warranty deed requested by defendants was a breach of the contract, but said breach was not so material or substantial so as to entitle defendants to rescission or to forfeiture or termination.

(5) Defendants are entitled to specific performance with regard to the request for warranty deed.

(6) Plaintiffs had actual possession of the premises during 1986 and through the date of the hearing in this case.

(7) Defendants are entitled to possession of the premises and to any rents and profits generated during plaintiffs' possession of the premises.

(8) That the rents and profits, including government payments, generated by the subject property during the year 1986, net of real estate taxes paid upon the property by the plaintiffs, is $23,449.13.

(9) That the parties stipulated in open court that the tracts of land for which a deed was demanded by defendants in June of 1985 have diminished in value by $16,000 since the time of said demand. Defendants are entitled to recover from plaintiffs for the diminution in value by reason of plaintiffs' refusal to convey said property.

(10) Pursuant to the agreement, defendants are entitled to recover from plaintiffs their attorney fees incurred in in this cause in the amount of $14,933.57.

(11) Plaintiffs shall deliver to defendants warranty deeds to the parcels requested by defendants together with proof of merchantable title thereto.

(12) Defendants shall be obligated to the plaintiffs to pay the annual principal installments with interest for the years 1985 and 1986 in the total amount of $132,500. Defendants shall be entitled to a credit against said amount of $54,382.70, said sum representing the $16,000 diminution in value of the tracts, $23,449.13 in rents and profits including government payments obtained by the plaintiffs during the year 1986, and $14,933.57 as defendants' attorney fees in this cause, leaving a net amount due plaintiffs $78,117.30.

Billy and Barbara Bell appeal from the judgment of the trial court, asking that the judgment be reversed as to the trial court's refusal to recognize a forfeiture and termination of the contract. The Hickoxes also appeal from the trial court's decision. The Hickoxes raise three issues for our review. The first issue is whether the Bells paid a sufficient amount of principal to entitle them to conveyance of the realty demanded. The second issue is whether the court erred in finding the plaintiffs in default of the contract. Third, the plaintiffs argue that the trial court erred in dismissing the Indiana National Bank as a party defendant. We will first consider whether the Bells

paid a sufficient amount of principal to be entitled to a conveyance of the 83.67 acres they demand under the contract.

In its order dated August 21, 1987, the court found that the defendants had paid $83,333.34 toward the principal amount owed under the contract. The Hickoxes first argue that the only payment against principal made by the Bells was the $50,000 down payment, and that any amount of money paid by the Hesses is not to be credited to the Bells as payment under the contract. The contract allows for assignment by the parties. The validity of the assignment and reassignment of the contract by the Bells to the Hesses, and the Hesses to the Bells, was never raised in the circuit court. It is axiomatic that questions not raised in the trial court are deemed waived and may not be raised for the first time on appeal. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500, 475 N.E.2d 872, 879; *Board of Education v. Kusper* (1982), 92 Ill. 2d 333, 343, 442 N.E.2d 179, 184.) We assume, therefore, that the assignment is valid. "It is well settled in Illinois that when a valid assignment is executed, the assignee (1) acquires all of the interest of the assignor in the property that is transferred and (2) stands in the shoes of the assignor." (*Stavros v. Karkomi* (1976), 39 Ill. App. 3d 113, 123, 349 N.E.2d 599, 607.) As the right to assignment of the contract was clearly provided for in the written agreement, and since the validity of the assignment and reassignment of the contract between the Bells and the Hesses was not contested at trial, we find that the money paid by the Hesses under the contract is to be credited to the Bells as payment under the contract.

The Hickoxes next argue that assuming that all amounts which the Mt. Erie State Bank shows paid are credited to the Bells as payment under the contract, the Bells have not paid a sufficient amount of principal to be entitled to a conveyance of 83.67 acres. They contend that, assuming early deeding is authorized under the contract, the most the Bells could be credited for as principal with regard to the early deeding provision, is $33,333.34. The Hickoxes theorize that the initial $50,000 paid by the Bells is a down payment, not intended to be credited as principal until all other annual payments have been paid under the contract. Plaintiffs draw our attention to paragraph 7 of the contract, which provides that upon default of any payment, "Sellers *** may declare this Agreement forfeited and terminated, and may re-enter possession of the subject land and *retain all monies paid* hereunder as and *for reasonable rentals and liquidated damages*, but not as any penalty." (Emphasis added.) They argue that to allow the $50,000 to be applied against principal in an early deeding

of the property would: (1) ignore the liquidated damages clause in the contract, and (2) defeat the purpose of a down payment in a land installment contract; that is to provide the vendor security for the purchaser's performance of the contractual obligations.

■■ Although the issue was not raised by the parties, we find it first necessary to determine whether the forfeiture provision is for a penalty or liquidated damages. Whether a provision for damages is a penalty clause or a liquidated damages clause is a question of law. (*Weiss v. United States Fidelity & Guaranty Co.* (1921), 300 Ill. 11, 16, 132 N.E. 749, 751; *Morris v. Flores* (1988), 174 Ill. App. 3d 504, 506, 528 N.E.2d 1013, 1015.) If the purported liquidated damages clause herein is in fact a penalty imposed upon a party to secure prompt performance of a contract rather than a term giving compensatory damages to the nondefaulting party, then it is unenforceable. (*Scofield v. Tompkins* (1880), 95 Ill. 190, 193; *Heckmann v. Mid States Development Co.* (1965), 60 Ill. App. 2d 113, 207 N.E.2d 715.) In *Bauer v. Sawyer* (1956), 8 Ill. 2d 351, 359, 134 N.E.2d 329, 333, our supreme court quoted the Restatement of Contracts as a declaration of the requirements a party must meet in order to show that a contractual provision is for liquidated damages and is not a penalty:

> "An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation." (Restatement of Contracts §339(I) (1932); see also Restatement (Second) of Contracts §356(1) (1979).)

In addition to the above requirements for determining that a damages clause is enforceable, it must be shown that it was the intention of the parties to agree in advance as to the settlement of damages that might arise upon a breach of contract. *Heckmann v. Mid States Development Co.* (1965), 60 Ill. App. 2d 113, 118, 207 N.E.2d 715, 718; *Curtin v. Ogborn* (1979), 75 Ill. App. 3d 549, 554, 394 N.E.2d 593, 598.

■ We are aware that a liquidated damages clause will be given effect if it is difficult to determine the actual damages which would result in event of breach. We do not find the actual damages difficult to assess in this case. The contract establishes the value the parties had determined as the per-acre value of the land to be conveyed. Evidence as to land values is available and could easily be used to calculate any increase or diminution in value to the land in question. Fur-

thermore, it would not be difficult to calculate the rent and or profits generated during any party's possession of the premises. As a determination of actual damages in the event of breach of contract would not be difficult, we find as a matter of law that the liquidated damages clause is not enforceable.

Notwithstanding our finding that the liquidated damages clause is unenforceable, plaintiffs argue that to allow the $50,000 down payment to be applied against principal in early deeding of the property would deprive them of security for the purchasers' performance of the contract. Plaintiffs cite *Pruett v. La Salceda, Inc.* (1977), 45 Ill. App. 3d 243, 359 N.E.2d 776, in support of their position that the seller may retain a down payment even though there was nothing in the contract authorizing its retention. In *Pruett* the purchasers brought suit against sellers to recover earnest money paid to the sellers pursuant to a written contract for the purchase of a home. The sales contract required a partial down payment of $1,000, with the balance of the down payment, $7,700, to be paid within 10 days and the balance of the purchase price due at closing. Upon the purchasers' default, the court held in favor of the sellers in allowing them to retain the earnest money deposit. *Pruett* relied on *Linster v. Regan* (1969), 108 Ill. App. 2d 459, 248 N.E.2d 751, which held that, in the absence of an express contract provision to the contrary, earnest money or down payment should be accepted as the bargain and agreement of the parties as an assurance to the seller that the buyer will perform. *Linster*, 108 Ill. App. 2d at 463, 248 N.E.2d at 753.

As in *Pruett* and *Linster*, the contract in the case at bar contains no express provision for the retention of the earnest money by the seller in the event of breach. *Pruett* and *Linster*, however, did not involve installment contracts where early deeding was contemplated by the parties. The contract at issue does contain an express provision:

> "Buyers herein shall have the option as payments are paid upon the entire purchase price *** and that as the Buyers herein have paid the annual amount of money upon said contract; said money shall entitle the Buyers herein to a Warranty Deed to such land as may then be paid for."

To read the provision "to such land as may then be paid for" as *not* including the $50,000 down payment would be contrary to the unequivocal meaning of the contract read as a whole. The law is well settled that a contract must be read as a whole without any one clause standing alone. (*Board of Trade v. Dow Jones & Co.* (1983), 98 Ill. 2d 109, 122, 456 N.E.2d 84, 90; *La Throp v. Bell Federal Savings &*

*Loan Association* (1977), 68 Ill. 2d 375, 381, 370 N.E.2d 188, 191, *cert. denied* (1978), 436 U.S. 925, 56 L. Ed. 2d 768, 98 S. Ct. 2818.) Plaintiffs argue that the buyers and the trial court have ignored the term "annual amount of money." Plaintiffs assert that this phrase refers to the annual payments required under the contract, and that only the annual payments may be used in calculating the amount of principal which has been paid toward the purchase price in effectuating the early deeding of property. We disagree. To give the contract provision at issue the meaning plaintiffs ascribe to it would require our inserting language in the contract which is clearly not there. It is our opinion that based on the contract language and the nature of the undertaking therein declared, the $50,000 down payment was included in the phrase "such land as may then be paid for." Plaintiffs themselves admit that the $50,000 was to be applied as principal against the total purchase price. Had the parties desired to limit the early deeding of property to land valued at an amount of principal as then paid for, less the $50,000 down payment, such language should have been included in the contract. No such language having been included, we agree with the meaning ascribed to the contract provision by the trial court.

Before we address the issue of whether the trial court erred in finding that the plaintiffs' failure to deliver the warranty deeds requested by defendants was a breach of the contract, we will first address the issue whether the trial court properly admitted extrinsic evidence in interpreting the contract. Plaintiffs argue that the contract does not completely disclose the agreement between the parties concerning the restriction on early deeding for the sole purpose of building a house. Plaintiffs insist that admission of the extrinsic evidence was necessary for the court to discern the true intent of the parties in providing for early deeding and in limiting early deeding only to land upon which to build a house. Plaintiffs contend that the trial court erred in construing the contract along with the extrinsic evidence to allow early deeding for anything other than to allow the buyers to construct a house and for any tract of land less than what is described in the contract as an entire tract. The Bells argue that the trial court did not find the agreement ambiguous and that the admission of extrinsic evidence was not proper.

■ The primary object of a court in construing a contract is to give effect to the intention of the parties. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283, 154 N.E.2d 683, 689.) Generally, the intention of the parties is to be determined from the final agreement executed by them rather than from preliminary negotia-

tions and the construction placed upon the agreement by the parties (*Lenzi v. Morkin* (1984), 103 Ill. 2d 290, 293, 469 N.E.2d 178, 179; *Martindell*, 15 Ill. 2d at 283, 154 N.E.2d at 689), but when there is an ambiguity arising from terms of a contract, meaning may be derived from extrinsic facts surrounding formation. *Mid-City Industrial Supply Co. v. Horwitz* (1985), 132 Ill. App. 3d 476, 482, 476 N.E.2d 1271, 1275; *La Throp v. Bell Federal Savings & Loan Association* (1977), 68 Ill. 2d 375, 384, 370 N.E.2d 188, 192, *cert. denied* (1978), 436 U.S. 925, 56 L. Ed. 2d 768, 98 S. Ct. 2818.

■■ As has already been detailed in the beginning of this opinion, the contract provides that the "[b]uyers herein shall have the option as payments are paid upon the entire purchase price *** and that as the [b]uyers herein have paid the annual amount of money upon said contract; said money shall entitle the [b]uyers herein to a Warranty Deed to such land as may then be paid for." The option provision of the contract further provides that "all costs of deeds and abstracts *** shall be at [b]uyers' expense; the conveyances selected by the [b]uyers shall be carved out of the total acreage sold." It is clear that the terms employed in the agreement viewed in their entirety express the parties' intent that the purchasers would have more than one option to demand warranty deeds as they paid for the land. The option provision refers to more than one deed and one abstract by the use of the plural of those words. The use of the term *carved out* also evidences the parties' intent to allow for early deeding of acreage if the purchasers chose to exercise said option and it expresses no restriction as to the amount or location of acreage. The express language of the agreement convinces us that no ambiguity exists. The mere fact that the parties do not agree upon the meaning of the terms of a contract does not create an ambiguity. *L.K. Comstock & Co. v. Morse/UBM Joint Venture* (1987), 153 Ill. App. 3d 475, 480, 505 N.E.2d 1253, 1256-57.

■■ In view of our finding that the contract is not ambiguous, the court erred in admitting the extrinsic evidence about the circumstances surrounding the negotiation of the contract. We find, however, after reviewing the record and the extrinsic evidence admitted at trial, that the admission of said evidence was harmless error. The evidence consisted of a transcript of a tape-recorded meeting between the Hickoxes and the Bells to discuss the terms of the sale of the Hickox farm, which occurred prior to execution of the contract. Present at that meeting were Wayne and Lucille Hickox, Bill and Barbara Bell, the Hickoxes' attorney William Kidwell, and his wife, Irma Kidwell. With the consent of all those present, Irma Kidwell recorded

a substantial portion of that meeting. References made by the parties at that meeting to early deeding of acreage were as follows:

"MR. BELL: When we get so much paid on the principal, then we can get some land made into our name.

* * *

Lets bring something else up. There are three things that Wayne and Mrs. Hickox have agreed on and Bill didn't get it on there.

We get so many acres after so many dollars was paid, if we want to build a new house on there, they are not going to let us borrow money for a house on a contract place. You have to own it. What we discussed was [S]ay we get the 80A paid for. Or the home place paid for, or whatever we got enough principal paid down on would go into our names so we could go ahead with a house.

WKK: Is that satisfactory with you folks[?]

WAYNE: Yes we agreed.

WKK: Let me get this on the record here so I can pick it up. Do you want me to figure the price on 80A or do you want it specified now[?]

MR. BELL: No because we don't know the place that well.

WKK: Let the contract show that when the buyers have paid a sufficient amount to warrant the conveyance of a Warranty Deed to them that the contract to purchase shall permit such a sale. The ·Sellers agree that they will convey by good and sufficient Warrant[y] Deed such acreage as such payment as been made on contract.

WKK: That is going to put a little more expense on you because you are going to have to carve out whatever acreage you want. Wayne do you want to split the cost of the Abstract to carve it out? Do you or have you said anything about if these folks have that year to or put an option in here about a delay in payment[?]"

Contrary to plaintiffs' belief, the negotiations that took place between the parties as evidenced by the transcript of the meeting do not conclusively establish that constructing a house was the sole reason that the Bells requested early deeding. It is also clear that the parties did not discuss limiting the early conveyance of acreage to specific tracts.

██ ██ We find that the contract does not limit the early conveyance of acreage to land necessary to build a house. Nor does the contract restrict early deeding of acreage to entire tracts. As noted *supra,* defendants paid a sufficient amount of principal to entitle them

to an early conveyance of property. It is clear from the face of the contract that defendants were entitled to request the warranty deeds demanded of the Hickoxes, and that the Hickoxes' failure to deliver the warranty deeds constituted a breach of contract. To state a cause of action for breach of contract, a plaintiff must show (1) the existence of a valid and enforceable contract; (2) the performance of the contract by plaintiff; (3) the breach of the contract by defendant; and (4) a resulting injury to plaintiff. (*Allstate Insurance Co. v. Winnebago County Fair Association, Inc.* (1985), 131 Ill. App. 3d 225, 233, 475 N.E.2d 230, 236.) A defendant's failure to comply with the duty imposed by the contract gives rise to the breach. (*Allstate Insurance,* 131 Ill. App. 3d at 233, 475 N.E.2d at 236.) We agree with the trial court's finding that plaintiffs' failure to deliver the warranty deeds requested by defendants was a breach of the contract.

We now turn to the issue raised by the Bells, that is whether the trial court erred in refusing to recognize a forfeiture and termination of the contract. The Bells argue that the default provision of the contract gave them the option to declare the contract forfeited and terminated or to seek specific performance of the contract. It is true that, generally, where a forfeiture has occurred in the manner prescribed in a contract the court will give effect to it. (See, *e.g., Eade v. Brownlee* (1963), 29 Ill. 2d 214, 219, 193 N.E.2d 786, 789.) However, forfeitures are not favored by courts of equity, and the parties will be relieved from a technical forfeiture if injustice results from its enforcement. (See, *e.g., Rose v. Dolejs* (1953), 1 Ill. 2d 280, 289-90, 116 N.E.2d 402, 409; *Allabastro v. Wheaton National Bank* (1979), 77 Ill. App. 3d 359, 366, 395 N.E.2d 1212, 1217; *Krentz v. Johnson* (1976), 36 Ill. App. 3d 142, 145, 343 N.E.2d 165, 167.) Whether or not a breach of contract is material, thereby discharging the other's duty to perform, is a question to be decided based upon the inherent justice of the matter. *Hanson v. Duffy* (1982), 106 Ill. App. 3d 727, 732, 435 N.E.2d 1373, 1378, quoting *Leazzo v. Dunham* (1981), 95 Ill. App. 3d 847, 850, 420 N.E.2d 851, 854. See also Restatement (Second) of Contracts §241, Comments (1979).

Here the refusal to tender the deeds did not go to the essential purpose of the contract. The refusal of the Hickoxes to execute the warranty deeds requested by the Bells would not have deprived the Bells of possession of the premises. The record reflects that the Bells voluntarily relinquished possession after notice of termination of the contract was served on the Hickoxes. The Hickoxes never refused to accept payments made under the contract, and there was never any attempt by the Hickoxes to preclude the Bells from continuing

their farming operations on the land in question. In addition, there was no evidence that the Hickoxes were abandoning the contract. Under the circumstances, the general purpose of the contract could be accomplished without declaring a forfeiture by ordering the Hickoxes to convey the executed warranty deeds requested by the Bells, ordering the payment of any damages sustained by the Bells, and ordering the Bells to make the installment payments due under the contract.

■■ It is well settled that a reviewing court will not disturb the findings of the trier of fact unless clearly against the manifest weight of the evidence. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 307, 367 N.E.2d 678, 684.) The trial court found that, as the breach of the contract by the Hickoxes was not material, the notice of termination served by the Bells was not effective to rescind or forfeit the contract. We agree with the trial court's finding that the Bells are entitled to specific performance with regard to their request for warranty deeds. We further agree with the lower court's finding that the Bells are entitled to possession of the premises described in the contract and to any damages incurred by them as a result of plaintiffs' breach. As the parties do not raise the issue of whether the damages awarded by the court are proper, we need not address that issue.

The plaintiffs' final issue on appeal is whether the trial court erred in dismissing the Indiana National Bank as a party defendant. Plaintiffs allege that once the contract was entered into between the Bells and the bank, under which the bank agreed to pay the indebtedness owed under the contract to the Hickoxes, the Hickoxes became third-party beneficiaries of the contract between the Bells and the bank. The Hickoxes argue that their third-party beneficiary status gives them a vested right which cannot be modified without the Hickoxes' prior consent.

■■ ■ The courts in Illinois have distinguished between third-party donee beneficiaries and third-party creditor beneficiaries in determining what rights each has with regard to the third-party contract. A donee beneficiary, as distinguished from a creditor beneficiary, is a third party to whom the benefit comes without cost, such as a donation or gift. A creditor beneficiary is a third party to whom a preexisting duty or liability is owed. (*Robson v. Robson* (N.D. Ill. 1981), 514 F. Supp. 99, 102.) The Hickoxes are categorized as creditor beneficiaries. The courts of this State have consistently held that the third-party beneficiary obtains a vested right as against the promisor, and this right, once given, deprives the promisor of any interest or right in the subject matter of the promise, including the right to alter, rescind or revoke the promise. (*Bay v. Williams* (1884),

112 Ill. 91, 1 N.E. 340; *Conerty v. Richtsteig* (1942), 379 Ill. 360, 41 N.E.2d 476; *Town & Country Bank v. James M. Canfield Contracting Co.* (1977), 55 Ill. App. 3d 91, 370 N.E.2d 630; *Pliley v. Phifer* (1954), 1 Ill. App. 2d 398, 117 N.E.2d 678.) Because creditor beneficiary cases only involve situations where a preexisting duty or liability is contractually transferred to a new party, there is never any question that the third-party beneficiary's rights vest as soon as the contract is executed. *Robson*, 514 F. Supp. at 102; *Pliley*, 1 Ill. App. 2d at 407, 117 N.E.2d at 682.

The contract between the Hickoxes and the Bells allowed the parties to assign their rights and obligations under the contract. Once the Bells assigned the contract to the Indiana National Bank, the Hickoxes became vested third-party creditor beneficiaries. The original contract did not authorize the assignor or assignee to modify, revoke or otherwise alter the contract. Accordingly, as the Hickoxes never consented to releasing the Indiana National Bank of its obligations, the bank remains bound by its obligations under the contract. Therefore, we find that the trial court erred in dismissing the Indiana National Bank as a party defendant.

The bank contends that even if the Hickoxes are third-party beneficiaries of the agreement entered into between the Bells and the bank, they are beneficiaries of an agreement which by its terms did not preclude modification or reassignment of the agreement. It is the bank's position that once it assigned the rights and obligations conferred upon it by the Bells to another party, it was absolved of any liability on the original contract between the Hickoxes and the Bells. The Indiana National Bank cites the Restatement (Second) of Contracts section 311 (1979) in support of its theory that the court properly dismissed it as a party defendant. That section provides that, in the absence of language in the contract making the rights of a third-party beneficiary irrevocable, "the promisor and promisee retain the power to discharge or modify the duty by subsequent agreement" until such time as the beneficiary, without notice of the discharge or modification, "materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee." With the exception of *Board of Education of Community School District No. 220 v. Village of Hoffman Estates* (1984), 126 Ill. App. 3d 625, 467 N.E.2d 1064, which pointed out that apparently the majority of jurisdictions have now adopted the rule set forth in section 311, our research has not revealed any case in Illinois recognizing the application of that section.

In view of our supreme court's long-standing ruling on the imme-

diate vesting of creditor beneficiaries' rights, we do not feel free to adopt the position of the Restatement (Second) of Contracts section 311 (1979). However, even if we were to do so, it would not change the result herein. Under the facts of this case, if the plaintiffs were able to plead and prove that they had materially changed their position in justifiable reliance on the promise or that they had assented to it at the request of the Indiana National Bank or the Bells, they would come under the provisions of section 311 of the Restatement. Therefore, even under the bank's position, we feel that the trial court erred in refusing to allow the plaintiffs to amend their complaint. We reverse the trial court's order dismissing the Indiana National Bank as a party defendant and remand for proceedings consistent with this opinion.

For the reasons given, the judgment of the circuit court is affirmed in part and reversed in part and remanded.

Affirmed in part; reversed in part and remanded.

RARICK and GOLDENHERSH, JJ., concur.